## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STANLEY YELARDY, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Civil Action No. 11-179-GMS |
| | ) |
| DAVID PIERCE, Warden, and | ) |
| ATTORNEY GENERAL OF | ) |
| THE STATE OF DELAWARE, | ) |
| | ) |
| Respondents.[1] | ) |

Stanley Yelardy. *Pro se* petitioner.

Gregory Smith, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for respondents.

### MEMORANDUM OPINION

March 31, 2014
Wilmington, Delaware

---

[1]Warden David Pierce replaced Warden Perry Phelps, an original party to this case. *See* Fed. R. Civ. P. 25(d).

Sleet, Chief Judge

Pending before the court is a petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254 filed by petitioner Stanley Yelardy ("Yelardy"). (D.I. 3; D.I. 18) For the reasons

discussed, the court will deny the petition.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

As summarized by the Delaware Supreme Court, the facts leading to Yelardy's arrest and

conviction are as follows:

> On March 12, 2003, at approximately 10:30 a.m., a black man wearing gloves, a stocking
> mask, and dark clothing entered the Delaware National Bank at 281 East Main Street in
> Newark brandishing a handgun and demanding money. An employee of the bank slipped a
> dye pack into the money bag before giving it to the robber. The robber fled the bank. A car
> filled with red smoke came "flying" out of the bank parking lot and crashed into another car.
> A black man wearing dark clothing and carrying a black bag ran from the car. An off-duty
> police officer pursued the robber, but did not catch him. However, within minutes of the
> robbery, [] Yelardy was taken into custody by Newark police officers. Yelardy was found
> siting on the steps of a business located at 319 East Main Street and was in possession of a
> handgun. At the police station, Yelardy confessed to the robbery.

*Yelardy v. State*, 945 A.2d 595 (Table), 2008 WL 450215 (Del. Mar. 12, 2008).

In April 2003, Yelardy was indicted on four counts of first degree robbery, four counts of

possession of a firearm during the commission of a felony, and one count each of wearing a

disguise during the commission of a felony, receiving stolen property, and second degree

reckless endangering. (D.I. 29 at 1) Prior to the start of his jury trial in August 2004, Yelardy

elected to discharge his counsel and proceed *pro se*. The jury found Yelardy guilty on all counts

and, in January 2005, the Superior Court sentenced Yelardy as an habitual offender to one

hundred and sixty years in prison. *Id.* The Delaware Supreme Court affirmed Yelardy's

convictions and sentence on direct appeal. *Yelardy v. State*, 2008 WL 450215 (Del. Mar. 12,

2008).

2

In April 2009, Yelardy filed a motion for post-conviction relief under Delaware Superior

Court Criminal Rule 61 ("Rule 61 motion"). *See Yelardy v. State,* 12 A.3d 1155 (Table), 2011

WL 378906 (Del. Feb. 14, 2011). The Superior Court denied the Rule 61 motion after

determining that Yelardy's claims were without merit or otherwise procedurally barred under

Delaware Superior Court Criminal Rule 61(i)(3) and (4). The Delaware Supreme Court affirmed

that decision. *Id.*

## II.    GOVERNING LEGAL PRINCIPLES

### A. The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

"to reduce delays in the execution of state and federal criminal sentences . . . and to further the

principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003).

Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only

"on the ground that he is in custody in violation of the Constitution or laws or treaties of the

United States." 28 U.S.C. § 2254(a). AEDPA imposes procedural requirements and standards

for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to

ensure that state-court convictions are given effect to the extent possible under law." *Bell v.

Cone*, 535 U.S. 685, 693 (2002).

### B. Standard of Review

When a state's highest court has adjudicated a federal habeas claim on the merits, the

federal court must review the claim under the deferential standard contained in 28 U.S.C. §

3

2254(d).[2] Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial. 28 U.S.C. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). This deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 131 S.Ct. 770, 784-85 (2011). As recently explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.*

Finally, when reviewing a habeas claim under § 2254(d), a federal court must presume that the state court's determinations of factual issues are correct. 28 U.S.C. § 2254(e)(1); *Appel*, 250 F.3d at 210. This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341(2003)(stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## III. DISCUSSION

---

[2]A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground. *Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).

4

Yelardy's petition asserts the following eleven grounds for relief: (1) the police officers violated his Fourth Amendment rights by arresting him without probable cause; (2) his Fifth Amendments rights were violated when the police questioned him prior to giving him *Miranda* warnings; (3) the trial court misinterpreted Delaware Rule of Evidence 609; (4) Officer Gates fabricated his in-court identification; (5) he was denied his Sixth Amendment right to counsel; (6) he was denied funds for an expert witness; (7) the jury selection process resulted in minorities being underrepresented on the jury; (8) transcripts were incomplete, edited, or withheld; (9) prosecutorial misconduct; (10) there was insufficient evidence to support the jury verdict; and (11) the indictment was invalid because the jury foreman's signature was forged.

## A. Claim One: Fourth Amendment Rights Violated

In claim one, Yelardy contends that the police violated his Fourth Amendment rights by arresting him without probable cause. This claim does not provide a basis for habeas relief.

Pursuant to *Stone v. Powell*, 428 U.S. 465, 494 (1976), a federal habeas court cannot review a Fourth Amendment claim if the petitioner had a full and fair opportunity to litigate the claim in the state courts. *Id.*; *see also Wright v. West*, 505 U.S. 277, 293 (1992). A petitioner is considered to have had a full and fair opportunity to litigate such claims if the state has an available mechanism for suppressing evidence seized in or tainted by an illegal search or seizure, irrespective of whether the petitioner actually availed himself of that mechanism. *See U.S. ex rel. Hickey v. Jeffes,* 571 F.2d 762, 766 (3d Cir. 1980); *Boyd v. Mintz,* 631 F.2d 247, 250 (3d Cir. 1980). Conversely, a petitioner has not had a full and fair opportunity to litigate a Fourth Amendment claim, and therefore, avoids the *Stone* bar, if the state system contains a structural defect that prevented the state court from fully and fairly hearing that Fourth Amendment argument. *Marshall v. Hendricks*, 307 F.3d 36, 82 (3d Cir. 2002). Whether or not a state court

incorrectly decided a petitioner's Fourth Amendment claim is immaterial to the "full and fair opportunity" analysis. *See Marshall*, 307 F.3d at 82 ("an erroneous or summary resolution by a state court of a Fourth Amendment claim does not overcome the [*Stone*] bar.").

Delaware Superior Court Criminal Rule 41 provides a defendant with a mechanism for filing a pre-trial motion to suppress evidence and raise Fourth Amendment issues. In this case, Yelardy filed many *pro se* pre-trial motions, including a motion to suppress his statement to the police, but he did not file a suppression motion challenging the probable cause for his arrest. Although Yelardy contends that his failure to file such a suppression motion should be excused because was representing himself, Yelardy's *pro se* status does not demonstrate that Delaware's system contains a structural defect preventing the trial court from hearing and considering his Fourth Amendment argument. In other words, the fact that Yelardy could have presented the instant Fourth Amendment claim to the Superior Court under Delaware Rule 41 precludes habeas review of the claim. Accordingly, the court will deny claim one as barred by *Stone*.

## B. Claim Two: *Miranda* Violation

In claim two, Yelardy contends that the Delaware Supreme Court erred in holding that the Newark police detective who took his confession did not violate his Fifth Amendment rights by asking several questions before informing Yelardy of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Yelardy presented this argument on direct appeal, and the Delaware Supreme Court denied it as meritless. Consequently, habeas relief will only be warranted if the Delaware Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law.

It is well-settled that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the

6

use of procedural safeguards effective to secure the privilege against self-incrimination."

*Miranda*, 384 U.S. at 444. Pursuant to *Miranda*, law enforcement officers must warn a person in custody prior to questioning that he has a right to remain silent, that anything he says may be used against him as evidence, and that he has a right to counsel. *Id.* A court must engage in a two-step inquiry to determine whether a person was in custody for *Miranda* purposes:

> [F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Three factors should be weighed when performing the second step of the custody inquiry: (1) the location of the questioning; (2) the information known by the officer concerning the suspect's culpability; and (3) whether the officer revealed his belief that the suspect was guilty. *U.S. v. Jacobs*, 431 F.3d 99, 105 (3d Cir. 2005).

The Supreme Court has clarified that "that the goals of the *Miranda* safeguards could be effectuated if those safeguards extended not only to express questioning, but also to its functional equivalent." *Pennsylvania v. Muniz*, 496 U.S. 582, 600 (1990). The functional equivalent of express questioning includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 601. However, questions that are asked "for record-keeping purposes" during a custodial interrogation constitute "routine booking questions" that fall outside *Miranda*'s ambit. *Muniz*, 496 U.S. at 601-02. "[R]outine booking

7

questions" are those that are asked to secure the "biographical data necessary to complete booking or pretrial services." *Id.*

On direct appeal, Yelardy argued that he was in custody for *Miranda* purposes because the detective's first contact with him was while he was in the holding cell. The detective asked Yelardy if he would speak with him, and Yelardy replied that he would, but that he did not want to incriminate himself. Yelardy was then taken to an interview room, and he contends that he answered twenty questions before he began to incriminate himself, at which time the detective read him his *Miranda* rights.

After reviewing the record and citing *Miranda*, *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), and *Herring v. State*, 911 A.2d 803 (Table), 2006 WL 3062899 (Del. 2006), the Delaware Supreme Court held that "neither the brief exchange between Yelardy and the detective in the holding cell, nor the detective's request for biographical data [in the interview room], was the functional equivalent of an interrogation. Rather, the record reflects that the detective interrogated Yelardy only after timely informing him of his *Miranda* rights, and that Yelardy chose to waive those rights." *Yelardy*, 2008 WL 450215, at *2.

To begin, the court notes that it does not entirely agree with the Delaware Supreme Court's conclusion that the detective's questions regarding Yelardy's biographical and pedigree information (i.e., name, address, and age) do not qualify as custodial interrogation "merely because the questions were not intended to elicit information for investigatory purposes." *See Muniz*, 496 U.S. at 601. The proper focus under *Innis* is the perspective of the suspect. *Id.*

Nevertheless, the court concludes that the Delaware Supreme Court's denial of Yelardy's *Miranda* claim was neither contrary to, nor an unreasonably application of, *Miranda* and its progeny. In this case, the Delaware Supreme Court made a factual determination that the

8

questions asked by the detective prior to the *Miranda* warnings were requests for biographical data. The court defers to this determination because Yelardy has not presented any clear and convincing evidence to rebut it. *See* 28 U.S.C. § 2254(e)(1); *Miller v. Fenton*, 474 U.S. 104, 114 (1985). In fact, during the suppression hearing, Yelardy actually admitted that the pre-*Miranda* questions pertained to his name, address, phone number, and his past criminal history (with respect to his familiarity with the process). (D.I. 18-1 at 80-82)

Having determined that the pre-*Miranda* questions were made "for record-keeping purposes only," they "fall outside the protections of *Miranda*." *Muniz*, 496 U.S.at 602. For all of these reasons, the court concludes that the Delaware state courts' rejection of Yelardy's *Miranda* claim was not contrary to, and did not involve an unreasonable application of, clearly established federal law. Accordingly, the court will deny claim two.

### C. Claim Three: Due Process Violation/State Evidentiary Error

Yelardy's third ground for relief involves the trial judge's ruling that his 1976 bank robbery conviction would be admissible under Delaware Rule of Evidence 609 for impeachment purposes if he testified. According to Yelardy, the trial court violated his due process rights and obstructed justice in making this ruling because the court inserted the word "last" into Delaware Rule of Evidence ("DRE") 609(b). (D.I. 3-1 at 4; D.I. 34 at 13) Yelardy also asserts that the State and the Delaware courts purposefully misconstrued the DRE 609(b) argument he raised on direct appeal and on post-conviction appeal. Specifically, he contends that he was not arguing that the trial court erred in allowing impeachment evidence pursuant to DRE 609; rather, he was (and still is) arguing that the trial court's misapplication of DRE 609(b) discouraged him from taking the stand and testifying in his own behalf.

As an initial matter, the court disagrees with Yelardy's contention that the Delaware courts misconstrued his argument on appeal. Although Yelardy's opening brief on appeal did contain two sentences regarding the alleged chilling effect the Superior Court's *in limine* ruling had on his right to take the stand in his own defense, the focus of his appellate argument was that the trial court erred in concluding that the 1976 conviction was admissible for impeachment purposes under DRE 609. (D.I. 31, App. Op. Br. in *Yelardy v. State*, No.57,2005, at 18-22) Yelardy's current argument that the trial court's DRE 609 prevented him from testifying appears to be his response to the Delaware Supreme Court's holding that:

A defendant challenging a trial court's ruling on the admissibility of a prior conviction for impeachment purposes must first testify and then challenge that ruling on appeal. In this case, Yelardy did not testify. By not testifying, Yelardy precluded any meaningful review of the Superior Court's ruling on appeal."

*Yelardy*, 2008 WL 450215, at *3.

Nevertheless, ignoring any possible prior misconstruction of claim three and procedural bars, the court concurs with the State's assertion that claim three as presented in this proceeding does not warrant habeas relief. First, to the extent Yelardy is arguing that the Delaware courts misinterpreted DRE 609, his argument presents an error of state law that does not present an issue cognizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

In turn, to the extent Yelardy is arguing that the Delaware state courts' application and/or alleged misinterpretation of the principles underlying DRE 609 somehow violated his due process rights, it is unavailing. Pursuant to clearly established Supreme Court precedent, in order to "raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." *Luce v. United States*, 469 U.S. 38, 42 (1984); *see also Ohler v. United States*, 529 U.S. 753, 760-01 (2000). The reasoning is that "allowing a silent

10

defendant to appeal would require courts either to attempt wholly speculative harmless-error analysis or to grant new trials to some defendants who were not harmed by the ruling and to some who never even intended to testify." *Ohler*, 529 U.S. at 760-61. As explained by the *Luce* Court, "[b]ecause an accused's decision whether to testify seldom turns on the resolution of one factor, a reviewing court cannot assume that the adverse ruling motivated a defendant's decision not to testify. In support of his motion a defendant might make a commitment to testify if his motion is granted; but such a commitment is virtually risk free because of the difficulty of enforcing it."[3] *Luce*, 469 U.S. at 463.

Reduced to its core, Yelardy's argument is that the trial court's *in limine* ruling directly caused him to decide not to testify. Despite his contention to the contrary, applying the principles of the *Luce/Ohler* rule to Yelardy's situation "did not unconstitutionally burden [his] right to testify, because the rule [did] not prevent [him] from taking the stand and presenting any admissible testimony [he] chooses." *Ohler*, 529 U.S. at 759. Accordingly, the court will deny claim three.

### D. Claim Four: Due Process Violation Caused By Witness Perjury

Yelardy's next ground for relief is that his due process rights were violated because Officer Gates lied when he testified that Yelardy was the individual he chased on the day of the robbery. Yelardy also contends that Officer Gates' in-court identification was not supported by any independent out-of-court identification or described in any report. More specifically, Yelardy asserts:

---

[3]Although *Luce* involved a ruling on a motion *in limine* pursuant to Federal Rule of Evidence 609(a), its holding has been extended to habeas challenges to state evidentiary issues. *See Dowell-El v. Howes*, 2010 WL 2474795, at *13 (E.D. Mich. May 14, 2010).

Officer Gates, on the day of the robbery, March 12, 2003, observed a car collision, and [then observed] a black male exit the vehicle and run, he gave chase on foot after the suspect. Officer Gates' report indicates that he gave chase after a black male; the he lost sight of the subject, and returned to the area of the car collision. [] Officer Gates' report makes no reference to any identification of the suspect, other than a black male. Eighteen months later, Officer Gates testifies that Petitioner is the individual that he chased. On cross-examination, it becomes obvious that Officer Gates never identified Petitioner on the scene. On redirect examination through leading questions by the State, Officer Gates agrees with the question/statement, "He was brought by in a car and they asked is this the guy you chased?"

(D.I. 3-1 at 5-6)

Claims involving in-court and out-of-court identifications are governed by the standard of "fairness as required by the Due Process Clause of the Fourteenth Amendment." *Manson v. Brathwaite*, 432 U.S. 98, 113 (1977). Admission of identification statements is permitted unless the identification procedure is (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification. *Id.* at 107. Notably, Yelardy does not contend that the State used an overly suggestive identification procedure, but rather, he contends that the in-court identification was not substantiated by anything else in the record. In other words, the essence of Yelardy's argument is that Officer Gates' in-court identification was completely fabricated and not credible.

It is well-settled that state court credibility determinations do not provide a proper issue for federal habeas relief. *See Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)("28 U.S.C. 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."). In this proceeding, Yelardy has not provided any evidence to support his self-serving allegation that Officer Gates

12

lied on the witness stand or to cast any doubt on the veracity of Officer Gates' testimony. Accordingly, the court will deny claim four.[4]

### E. Claim Five: Violation of Sixth Amendment Right to Counsel

Yelardy asserts that his Sixth Amendment right to counsel was violated in various ways, and his arguments fall into two categories: deprivation of counsel and ineffective assistance of counsel. The Delaware Supreme Court adjudicated Yelardy's allegations on the merits. Therefore, habeas relief will only be warranted if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

The clearly established Supreme Court precedent governing ineffective assistance of counsel claims is the two-pronged standard enunciated by *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. Under the second *Strickland* prong, a petitioner must demonstrate "there is a reasonable probability that,

---

[4]Yelardy's argument on direct appeal was similar, if not identical, to the argument presented here. However, the Delaware Supreme Court interpreted the argument as asserting that "Gates' in-court identification was tainted by an unnecessarily suggestive out-of-court 'show up' identification procedure. *Yelardy*, 2008 WL 450215, at *3. The Delaware Supreme Court described the "show up" as consisting of Officer Gates' act of "confirming verification" with "several police officers" at the scene of the crime that Yelardy was the "gentleman that he had seen leaving the accident and the same man that he had chased." *Id.* at *3 n. 19. The court does not construe Yelardy's present contention to be that the manner of obtaining Officer Gates' verification when Yelardy was detained constituted an overly suggestive show-up. However, even if the court were to construe Yelardy's instant argument in this manner, the court would deny the claim. After considering Gates' trial testimony, the Delaware Supreme Court held that, "it appears that Gates had ample opportunity to view Yelardy and that his subsequent identification of Yelardy in court was without a substantial likelihood of misidentification." *Yelardy*, 2008 WL 450215, at*3. This decision was not contrary to, or based upon an unreasonable application of, *Manson*.

but for counsel's error the result would have been different." *Id.* at 687-96. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* at 688.

In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-260 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987). Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable." *Strickland*, 466 U.S. at 689.

Turning to the first prong of the § 2254(d)(1) inquiry, the court notes that the Delaware Supreme Court identified *Strickland* as governing Yelardy's claims regarding the denial of counsel. As such, the Delaware Supreme Court's decision was not contrary to clearly established federal law.

The court must also determine if the Delaware Supreme Court reasonably applied *Strickland* to the facts of Yelardy's case. When performing this inquiry, the court must review the Delaware state court decisions with respect to petitioner's ineffective assistance of counsel claim through "doubly deferential" lens. *See Harrington,* 131 S.Ct. at 788. In other words, "the question is not whether counsel's actions were reasonable, [but rather], whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

## 1. Deprivation of counsel

Yelardy contends that he was actually deprived of counsel during his custodial interrogation. He also contends that he was constructively denied counsel: (a) during the scheduled preliminary hearing because appointed counsel did not attend; (b) during the arraignment because appointed counsel did not attend; and (c) during the portion of his criminal

14

proceedings where he represented himself because his decision to proceed *pro se* was involuntary. The court will review each claim in seriatim.

### a. Deprivation during custodial interrogation

Yelardy's contention that he was denied his Sixth Amendment right to counsel when he was interrogated without counsel is unavailing. Although a defendant has a Sixth Amendment right to counsel at all "critical stages" of the proceedings, this right only attaches after the adversarial process has been initiated. *See United States v. Wade*, 388 U.S. 218, 227-28 (1967). Here, Yelardy's Sixth Amendment right to counsel had not yet attached at the time of his police interrogation because he had not yet been formally charged with the robbery at the time he was interviewed. *See Moran v. Burbine*, 475 U.S. 412, 429-30 (1986). Therefore, to the extent Yelardy contends that he was denied his Sixth Amendment right to counsel during the custodial hearing, the argument is meritless.

Instead, Yelardy's claim that he was deprived of counsel during the interrogation must be analyzed under *Miranda* to determine if his Fifth Amendment right to counsel was violated. Notably, on direct appeal, the Delaware Supreme Court rejected Yelardy's claim that his *Miranda* rights were violated. The Delaware Supreme Court specifically held that that the detective timely informed Yelardy of his *Miranda* rights, and that Yelardy voluntarily and knowingly chose to waive those rights. *Yelardy*, 2008 WL 450215, at *2. When Yelardy raised the instant "denial of counsel" argument in his Rule 61 motion, the Superior Court referenced the Delaware Supreme Court's decision on direct appeal, and denied Yelardy's Rule 61 claim that he was actually denied representation during the police interrogation following his arrest. Once again, the Superior Court explained that Yelardy "was advised of his *Miranda* rights and he

15

waived those rights, which included the right to an attorney." (D.I. 3-2 at 12) The Delaware Supreme Court affirmed that decision on post-conviction appeal.

After reviewing Yelardy's instant argument within the applicable Fifth Amendment/*Miranda* framework, the court concludes that the Delaware state courts reasonably applied clearly established federal law in denying his contention that he was denied counsel during the police interrogation. As previously discussed, the fact that the detective only asked Yelardy questions about his biographical and pedigree data prior to informing Yelardy of his *Miranda* rights means that asking those questions did not violate Yelardy's Fifth Amendment rights. As such, Yelardy cannot demonstrate that he was prejudiced by the absence of counsel during this routine "booking" procedure.

In turn, given Yelardy's subsequent knowing and voluntary waiver of his *Miranda* rights, he cannot successfully argue that the absence of counsel during the remainder of the interrogation violated his Fifth Amendment right to counsel.[5] Accordingly, the court will deny this portion of claim five as meritless.

### b. Appointed counsel did not attend preliminary hearing or arraignment

Yelardy also contends that the Public Defender's Office's manner of scheduling attorneys for hearings constructively denied him representation by counsel during his preliminary hearing and arraignment, because the attorney assigned to his case did not attend either proceeding. Yelardy presented this same argument to the Superior Court in his Rule 61 motion, and that court rejected the claim for failing to satisfy either prong of *Strickland.* Referring to former stand-by counsel's Rule 61 affidavit, the Superior Court found that: (1) Yelardy was not deprived of his

---

[5]Notably, Yelardy does not contend that his waiver of his *Miranda* rights was involuntary or unknowing.

16

Sixth Amendment right to counsel because he was represented by an attorney in the Public Defender's Office during his preliminary hearing and arraignment; (2) Yelardy failed to demonstrate prejudice under *Strickland* with respect to the preliminary hearing because, even if no attorney was present, the subsequent indictment made the issue moot; and (3) Yelardy also failed to demonstrate prejudice with respect to "substitute" counsel's performance during the arraignment. On post-conviction appeal, Yelardy argued that the Superior Court should have analyzed the instant argument under the presumed-prejudice standard set forth in *United States v. Cronic*, 466 U.S. 648, 659-60 (1984) because there was a "complete breakdown of the adversary process" in his case. The Delaware Supreme Court rejected this argument as belied by the record and applied the *Strickland* standard to Yelardy's deprivation of counsel allegations.

As an initial matter, the court concludes that the Delaware Supreme Court reasonably rejected Yelardy's assertion that the Superior Court should have reviewed his deprivation of counsel claims under the presumed-prejudice standard articulated in *Cronic*. The *Cronic* Court created a very limited exception to *Strickland*'s prejudice requirement, holding that there are three situations in which prejudice caused by an attorney's performance will be presumed: where the defendant is completely denied counsel at a critical stage; where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; or where the circumstances are such that there is an extremely small likelihood that even a competent attorney could provide effective assistance, such as when the opportunity for cross-examination has been eliminated. *Cronic*, 466 U.S. at 659 & n.25. With respect to exception two, the *Cronic* presumption of prejudice only applies when counsel has completely failed to test the prosecution's case throughout the entire trial. *See Bell v. Cone*, 535 U.S. 685, 697 (2002).

17

Here, the premise of Yelardy's complaint appears to be that he was constructively denied counsel because the attorneys who represented him during his preliminary hearing and arraignment were not the same assistant public defender who was assigned to represent him. As a general rule, representation of a defendant by multiple members of a public defender's does not, in and of itself, violate defendant's right to counsel or deny a defendant counsel. *See Siers v. Ryan*, 773 F.2d 37, 44 (3d Cir. 1985). Moreover, the record in this case demonstrates that Yelardy's specific situation does not fit within any of the three *Cronic* circumstances. Yelardy was represented by an assistant public defender during his preliminary hearing and arraignment, and Yelardy himself concedes this fact. Thus, Yelardy has failed to establish the factual predicate that defense counsel was completely absent during a critical stage of the proceeding. As such, the court construes Yelardy's true issue to be whether the representation provided by different attorneys in the public defender's office denied him effective assistance, and this issue is governed by *Strickland*.

Although an indigent defendant has a right to the appointment of counsel and effective representation, he does not have an absolute right to be represented by counsel of his own choosing. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). Moreover, a criminal defendant does not have a Sixth Amendment right to a "meaningful relationship" with counsel. *See Morris v. Slappy*, 461 U.S. 1, 14 (1983). "[T]he essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Considering that Yelardy was actually represented by an assistant public defender during his preliminary hearing and arraignment, and given Yelardy's failure to assert any specific allegations of deficient performance or prejudice with respect to the

18

representation provided by the different attorneys, the court cannot conclude that he was denied representation by counsel or that the different attorneys who represented him provided constitutionally ineffective asistance. Accordingly, the court concludes that the Delaware Supreme Court reasonably applied *Strickland* in denying this portion of claim five.

### c. Constructive denial of counsel because he was forced to proceed *pro se*

Yelardy contends that he was denied counsel during the rest of his criminal proceeding because he did not voluntarily decide to represent himself. Specifically, he asserts that he was "forced to choose between proceeding to trial with a non-communicative attorney or representing himself." (D.I. 3-1 at 7). Yelardy presented this claim to the Delaware Supreme Court on direct appeal. The Delaware Supreme Court rejected the argument after determining that it was "not supported by the record." *Yelardy*, 2008 WL 450215, at *1. The Delaware Supreme Court also noted that the "transcript of the *Watson* colloquy reflects that the Superior Court thoroughly advised Yelardy of the risks associated with proceeding pro se and then properly determined that Yelardy made a knowing and intelligent waiver of his right to counsel." *Id.*

The clearly established Supreme Court precedent applicable to claims involving the Sixth Amendment right to self-representation is *Faretta v. California*, 422 U.S. 806 (1975) and its progeny. In *Faretta*, the Supreme Court held that a criminal defendant has a Sixth Amendment right to represent himself and, therefore, may affirmatively waive his right to counsel. A criminal defendant's waiver of counsel is only valid if the defendant is "made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Faretta*, 422 U.S. at 835. Pursuant to *Faretta*, a trial court must ensure that a defendant's waiver of counsel is knowing, voluntary, and

19

intelligent before permitting him to proceed *pro se*. *Iowa v. Tovar*, 541 U.S. 77, 88 (2004). Notably, a court is not required to follow any particular script in order to satisfy the *Faretta* inquiry requirement. *Id.*

On April 15, 2003, a public defender was assigned to represent Yelardy. Yelardy filed a motion to dismiss counsel on June 6, 2003, and then moved to proceed *pro se* on July 11, 2003. After holding a hearing on September 25, 2003, the Superior Court granted Yelardy's request to represent himself. During this hearing, the trial court reviewed predicate questions with Yelardy and confirmed his intentions to proceed *pro se*. In fact, Yelardy clearly stated that, "if I must have counsel and it must be him [referring to the public defender assigned to his case], then I'd rather proceed by myself." (D.I. 31, App. to State of Del's. Ans. Br. in *Yelardy v. State*, No.57,5008, at B9) After determining that Yelardy's decision to waive his right to counsel was knowing, intelligent, and voluntary, the Superior Court granted his request for self-representation, and appointed Yelardy's former counsel to act as stand-by counsel.

After reviewing the record, the court concludes that the Delaware Supreme Court's decision that Yelardy knowingly, intelligently, and voluntarily waived his right to counsel was neither contrary to,[6] nor based on an unreasonable application of, *Faretta* and its progeny. The Superior Court's on-the-record colloquy with Yelardy demonstrates that the state court satisfied *Faretta* by evaluating Yelardy's reasons for proceeding *pro se* and his capacity to do so, by explaining the various problems and pitfalls Yelardy might encounter, by describing the charges and potential penalties he was facing, and by establishing that Yelardy understood all risks and

---

[6]Although the Delaware Supreme Court did not cite *Faretta*, the Delaware Supreme Court cited to Delaware court cases that did rely on *Faretta. See Yelardy,* 2008 WL 450215, at *1 n.6.

20

consequences with his decision for self-representation. *See United States v. Jones*, 452 F.3d 223, 231 (3d Cir. 2006). Accordingly, the court will deny this portion of claim five as meritless.

## 2. Ineffective assistance of counsel

Yelardy's remaining Sixth Amendment allegations relate to the ineffectiveness of his appointed counsel prior to the time at which Yelardy started to represent himself. Yelardy contends that appointed counsel failed to conduct any investigations, did not communicate with him, and did not advocate on his behalf.[7] Yelardy raised these same contentions in his Rule 61 motion, and the Superior Court rejected them after concluding that Yelardy's vague and unsupported complaints failed to satisfy either prong of *Strickland*. The Delaware Supreme Court affirmed that decision.

In this proceeding, Yelardy has again presented ineffective assistance allegations that are vague and fail to demonstrate that he suffered *Strickland* prejudice. For instance, Yelardy contends that trial counsel did not investigate his case, but counsel only represented him for two months and was dismissed eleven months before trial began. There would have been ample time for counsel to conduct a thorough investigation and prepare for trial if counsel had remained on the case. Similarly, Yelardy alleges that counsel never discussed his case with him, but counsel's Rule 61 affidavit specifically denies that contention and asserts that counsel discussed the charges as well as Yelardy's habitual status and the elements of the habitual offender statute. Finally, although Yelardy contends that counsel failed to advocate for him, he does not identify any specific error by counsel nor does he allege any specific prejudice. For all of these reasons, the court will deny as meritless Yelardy's ineffective assistance of counsel allegations.

---

[7]The court has already addressed Yelardy's allegation that he was denied effective assistance of counsel because different attorneys from the Office of the Public Defender appeared on his behalf in the early stages of his proceeding. *See supra* at 16-18.

## F. Claim Six: Due Process Violation Due to Lack of Funds for Expert Witness

In his next claim, Yelardy contends that he was denied due process when the trial court refused to provide funds for an expert witness. Yelardy sought funding to hire an expert to evaluate his competency during his video-taped confession and to render an opinion as to whether his confession was truthful. *Yelardy*, 2008 WL 450215, at *3 n.26. On direct appeal, the Delaware Supreme Court reviewed Yelardy's argument within the framework of Delaware Superior Court Criminal Rule 44(e), and held that the Superior Court did not abuse its discretion in denying the funds. The Delaware Supreme Court also noted that Yelardy did not demonstrate prejudice resulting from the denial of funds. *Id.* at *3.

As a general rule, claims based on errors of state law are not cognizable on federal habeas review. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984). Thus, to the extent Yelardy's argument is that the Delaware state courts erred in applying Delaware Superior Court Criminal Rule 44(e), it does not provide a proper basis for federal habeas relief.

However, when the mental state of a defendant at the time of the offense is severely in question, the Supreme Court has held that the denial of funds for an expert can rise to the level of a due process violation. *See Ake v. Oklahoma*, 470 U.S. 68, 86-7 (1985). More specifically, the *Ake* Court held that, "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Id.* at 83.

Here, Yelardy asked for funds to hire an expert who would opine that he was somehow not competent to waive *Miranda* and/or that he gave an untruthful statement; he never raised an issue about his competency or mental state at the time of the offense. The record indicates that

22

Yelardy's purpose in seeking an expert and funds to hire one was to support his motion to suppress his video-taped confession. In ruling on his motion for expert funds, the trial court determined that Yelardy was coherent, logical, and deliberate at the time of confession as demonstrated on the videotape and as described by the police officer who interviewed him. The trial court also concluded that the truthfulness of his confession was a question for the jury. (D.I. 31, Appellant's App. to Reply Br. in *Yelardy v. State*, no.57,2005, at AR1-AR2) The Delaware Supreme Court affirmed that decision.

In this proceeding, Yelardy has provided no reason for the court to question the correctness of the trial court's determination that Yelardy was coherent and logical at the time of his confession, and the court has not found anything in the record even remotely suggesting that Yelardy's mental state at the time of his confession (or at the time of the offense) was "severely in question." Notably, Yelardy capably represented himself on trial, direct appeal, and post-conviction review, and he submitted dozens of appropriate motions. Given these circumstances, the court concludes that the denial of funds to hire an expert did not amount to a due process violation.

Yelardy's second reason for expert funding was to have an expert opine about the truthfulness of his confession. However, the truthfulness of a witness lies within the sole province of the jury and experts are not permitted to offer such opinions in Delaware Courts. *See generally Condon v. State*, 597 A.2d 7, 10 (Del. 1991); *State v. Floray*, 715 A.2d 855, 862 n.49 (Del. 1997). This state law issue of credibility does not fall within *Ake*'s ambit.

Accordingly, the court will deny claim six.

**G. Claim Seven: Unconstitutional Jury Empanelling Procedure**

23

Next, Yelardy contends that the jury empanelling process in New Castle County, Delaware violated his right to a jury comprised of a fair cross-section of the community. The Delaware Supreme Court denied this claim after determining that Yelardy did not make a *prima facie* showing that the jury's composition resulted from a systematic exclusion of minority members for racially motivated purposes.

Defendants are not entitled to a jury of any particular composition. *See Fay v. New York*, 332 U.S. 261, 284 (1947). Rather, defendants have a Sixth Amendment Right to have a petit jury selected from a representative cross-section of the community. *See Taylor v. Louisiana*, 419 U.S. 522, 528 (1975). Distinctive groups may not be systematically excluded in the jury selection process without jeopardizing a criminal defendant's right to an impartial jury trial. *Id.* at 531. "It should also be emphasized that, in holding that petit juries must be drawn from a source fairly representative of the community, we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Id.* at 539. "In order to establish a *prima facie* violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Yelardy presented the instant jury empanelling claim to the Delaware Supreme Court on direct appeal, which denied the claim after determining that Yelardy did not make a *prima facie* showing that the jury's composition resulted from a systematic exclusion of minority members for racially motivated purposes. In this proceeding, Yelardy alleges that a difference between the

24

percentage of minorities in New Castle County and the percentage in his jury venire establishes

that he was denied a fair cross-section of the community. However, Yelardy does not allege

systematic exclusion. As such, he has failed to establish a *prima facie* violation of the fair cross-

section requirement as required by *Duren*. Accordingly, the court will deny claim seven for

failing to satisfy § 2254(d)(1).

## H. Claim Eight: Incomplete Transcripts

In claim eight, Yelardy contends that his ability to present arguments on appeal was

hampered because the transcripts of his trial were incomplete and altered, and because he never

received transcripts from several hearings. On direct appeal, the Delaware Supreme Court

concluded that Yelardy was provided with the transcripts or portions of transcripts that were

germane to any issues he raised on direct appeal. After noting that Yelardy's transcript

allegations were the subject of a hearing in the Superior Court at which the Superior Court

denied his motion questioning the accuracy of the transcripts, the Delaware Supreme Court

specifically noted that Yelardy did not demonstrate any prejudice suffered by any transcript

errors or omissions. *Yelardy*, 2008 WL 450215, at \*4.

Although a defendant is entitled to a "record of sufficient completeness" that provides

him with the ability to properly evaluate his claims, a "record of sufficient completeness" does

"not translate automatically into a complete and verbatim" transcript. *See Mayer v. City of

Chicago*, 404 U.S. 189, 194 (1971). This requirement also "does not mean that the State must

waste its funds by providing what is unnecessary for adequate appellate review." *Id.* Other

courts considering the issue have held that, "to prevail on a claim that the record was inadequate,

a petitioner must prove that the missing portion of the transcript actually prejudiced his appeal in

some manner."[8] *Thomas v. Cain*, 2013 WL 5960808, at \*5 (E.D. La. Nov. 6, 2013)(collecting cases).

The Delaware Superior Court docket demonstrates that the State and the Superior Court extended an enormous amount of effort to provide Yelardy with his requested transcripts. For instance, the docket shows that Yelardy started filing motions requesting transcripts on November 3, 2004. Transcripts were filed, and the Delaware Supreme Court acknowledged receipt of the trial record on May 27, 2005. (D.I. 31, Del. Super. Ct. Crim. Dkt. Entries 107, 112, 119, 124, 125,126, 127, 133) Thereafter, on June 16, 2005, Yelardy filed in the Superior Court a "motion to impugn and authenticate trial transcripts." *Id.* at Entry 134. On July 26, 2005, the Delaware Supreme Court notified Yelardy that the briefing in his appeal would be stayed until the Superior Court acted on the pending motions. *Id.* at Entry 136. On September 12, 2005, the Superior Court conducted a hearing on Yelardy's motion to impugn the trancripts. The Superior Court judge withheld a decision, but stated he would make sure Yelardy would get the information he requested. *Id.* at Entry 139. Additional transcripts of Yelardy's numerous proceedings were filed during the period extending from October 4, 2005 to February 26, 2006. *Id.* at Entries 140, 141, 144, 145, 146, 148, 150. On February 27, 2006, during a hearing on Yelardy's request for counsel, the Superior Court judge indicated that he believed Yelardy had been provided with all of the transcripts requested, except for a transcript of a hearing held on February 6, 2006. The judge stated, "If I am incorrect, please so notify me and I will provide whatever assistance is necessary under the circumstances." *Id.* at Entry 161.

---

[8]While decisions from other federal district courts in other circuits are not precedential, the court finds their reasoning instructive and persuasive.

A little more than one year later, Yelardy filed an opening brief on appeal on February

28, 2007. (D.I. 31) In that brief, he asserted his arguments about missing or inadequate

transcripts. Thereafter, from May 8, 2007 through June 28, 2007, the State filed additional

transcripts in the Superior Court. (D.I. 31, Del. Super. Ct. Crim. Dkt. at Entries 178, 179, 180,

181) The Delaware Supreme Court issued its decision on direct appeal on February 20, 2008.

In this proceeding, Yelardy makes blanket allegations of missing and erroneous

transcripts without identifying how the absence of any specific transcript or error in a transcript

prejudiced him in any way. As such, the court defers to the Delaware Supreme Court's factual

finding that Yelardy was provided with all of the "relevant transcripts or portions thereof."

*Yelardy*, 2008 WL 450215, at \*4. Given these circumstances, the court concludes that the

Delaware Supreme Court's denial of the instant claim did not result in a decision that was

contrary to, or an unreasonable application of, clearly established federal law. Accordingly, the

court will deny claim eight.

## I. Claim Nine: Prosecutorial Misconduct

Yelardy alleges that he was denied a fair trial because the prosecutor engaged in

misconduct. Specifically, he contends that the prosecutor: (1) made two prejudicial statements

during closing argument; (2) called witnesses out of order; (3) withheld police reports; and (4)

solicited false testimony. The Delaware Supreme Court denied all of these allegations as

meritless. Therefore, Yelardy will only be entitled to habeas relief if the Delaware Supreme

Court's decision was either contrary to, or an unreasonable application of , clearly established

federal law.

In order for a prosecutorial misconduct claim to warrant federal habeas relief, the

prosecutor's comments must have "so infected the trial with unfairness as to make the resulting

27

conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 180 (1986)(citing *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). A prosecutorial misconduct claim must be examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abramson*, 507 U.S. 619, 638 (1993). In the Third Circuit, this inquiry involves examining "the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95 (3d Cir. 2001). Simply alleging misconduct fails to establish a violation of due process because the focus of the *Darden* inquiry is the unfairness of the trial, not the conduct of the prosecutor. *See Smith v. Phillips*, 455 U.S. 209, 219 (1982).

Here, although the Delaware Supreme court did not cite federal constitutional law during its analysis of Yelardy's prosecutorial misconduct claim, its focus on whether the prosecutor's conduct adversely affected the integrity of the judicial process mirrors the inquiry required by *Darden* and its progeny. Thus, the Delaware Supreme Court's decision was not contrary to clearly established federal law.

The court also concludes that the Delaware Supreme Court's decision involved a reasonable application of *Darden* and its progeny. First, the two statements the prosecutor made during closing argument do not even amount to misconduct, nevermind a violation of Yelardy's due process rights. For instance, during closing, the prosecutor said, "Dorothy Sutton, this lady now lives in fear" as he referenced the video surveillance of the robbery that had been previously played for the jury. He went on to describe how Yelardy held a gun to Ms. Sutton's head as he propelled her through the bank. Although Ms. Sutton did not testify at trial, she was clearly visible on the surveillance video viewed by the jury and was clearly being forced to walk around

28

the bank at gunpoint.  The prosecutor's statement about Ms. Sutton's fear was a rational inference from the evidence.

The second allegedly improper comment occurred during the prosecutor's rebuttal and was in response to Yelardy's claim that his confession was false and that he did not know about the robbery.  The prosecutor stated, "I mean, if he's just zapped down there to that porch by a Martian of out of North Carolina."  However, this sentence was only a small portion of the prosecutor's rebuttal:

> A false confession?  How would he even know the details he gives, the dye pack went off.  I mean, if he's just zapped down there to that porch by a Martial out of North Carolina, and that somebody else did this stuff, and laid it all along, how would he know what happened at the bank ten minutes earlier?

(D.I. 29 at 21)  When viewed in context with the prosecutor's entire rebuttal statement, it is clear that the prosecutor's intent was to highlight the implausibility of Yelardy's contention that his confession was false.

In short, after viewing these two comments in light of the trial record as a whole, the court concludes that the Delaware Supreme Court reasonably applied *Darden* in holding that Yelardy's right to a fair trial was not "prejudiced by any question or statement posed by the prosecutor." *Yelardy*, 2008 WL 450215, at *3.

Next, Yelardy contends that the prosecutor acted like a "saboteur" by calling witnesses out of order.  However, given Yelardy's failure to identify how he was prejudiced by the order of witnesses, the court concludes that the Delaware Supreme Court reasonably applied Supreme Court precedent in holding that calling the witnesses out of order did not so infect Yelardy's trial with unfairness as to amount to a violation of due process.

Yelardy's remaining claims of prosecutorial misconduct are similarly unavailing. With respect to his claim that the prosecutor solicited false testimony from Officer Gates, the Delaware Supreme Court denied the claim as meritless because there was no factual basis to the claim. In this proceeding, Yelardy has not provided any clear and convincing evidence to rebut that factual finding.

Next, Yelardy contends that the prosecutor withheld the police report of a "critical witness." To the extent this allegation should be construed as alleging a violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), it fails to warrant relief. In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The *Brady* rule applies to favorable and material evidence affecting the jury's judgment of a crucial prosecution witness' credibility. *Giglio v. United States*, 405 U.S. 150, 154 (1972). To establish a *Brady* violation, a petitioner must demonstrate that: (1) the prosecution either willfully or inadvertently suppressed evidence; (2) the evidence was favorable to the petitioner because it was exculpatory or had impeachment value; and (3) the evidence was material. *See Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004). Exculpatory evidence is material if the "evidence could reasonably be taken to put the case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

In this case, Yelardy has failed to establish a *Brady* violation because he has not shown that the police report actually existed or that testimony of the police officer who may have written the report constituted favorable and material evidence. Yelardy's purpose in obtaining the testimony and/or report was to either present another person as a suspect or to cast doubt on

30

the method by which one potential suspect is determined not to be the perpetrator, and one potential suspect is determined to be the perpetrator. It appears that a police officer initially stopped a potential suspect at the scene. An additional police officer arrived as back up. The first police officer, with back up present, determined that the person was not a suspect, and released him. The person was Antoine Stevenson, who was actually called as a witness during the trial. The police officer who stopped, and then released, Stevenson, and who may or may not have written a police report, had retired by the time the trial took place. The State was not able to locate the police officer and, consequently, the officer did not testify. However, the back up officer did testify at trial, and Yelardy cross-examined her. Stevenson also testified at trial, and Yelardy cross-examined him as well. Given these circumstances, Yelardy cannot demonstrate any error or prejudice with respect to the absence of the police officer and possible report.

The Delaware Supreme Court denied the instant claim on direct appeal because "Yelardy [] does not articulate how the absence of a police officer's testimony prejudiced his trial rights given that other witnesses testified as to the same events." *Yelardy*, 2008 WL 450215, at *3. For the reasons set forth above, the court concludes that the Delaware Supreme Court's decision was neither contrary to, or based upon an unreasonable application of , *Brady*. Accordingly, the court will deny claim nine.

### J. Claim Ten: Insufficient Evidence

In claim ten, Yelardy contends that there was insufficient evidence to support the jury verdicts. He appears to allege that the State failed to prove he was the person who robbed the bank. Yelardy presented this argument on direct appeal, and the Delaware Supreme Court denied it as meritless. Therefore, habeas relief will only be warranted if that decision was contrary to, or an unreasonable application of, clearly established federal law.

31

The United States Supreme Court precedent governing this insufficient evidence claim is *Jackson v. Virginia*, 443 U.S. 307 (1979). Pursuant to *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. Additionally, "a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326. However, it is not necessary that the evidence exclude every reasonable hypothesis except that of guilt. *Id.*

Although the Delaware Supreme Court did not cite to *Jackson* when it denied the instant claim, it appropriately relied on Delaware court cases that articulated the proper standard for reviewing such claims. As such, the Delaware Supreme Court's decision is not contrary to clearly established federal law.

Nor did the Delaware Supreme Court unreasonably apply *Jackson* in holding that, "it is clear that there was sufficient evidence, both direct and circumstantial, to support Yelardy's conviction on multiple counts of robbery in the first degree and possession of a firearm during the commission of a felony." *Yelardy*, 2008 WL 450215, at \*3. First and foremost, the jury in Yelardy's trial was presented with Yelardy's video-taped confession to the crime. The jury was also presented with testimony from bank employees who described the robbery and the robber's possession of a gun. One of the employees explained how she slipped a dye pack into the money bag before giving it to the robber. The jury heard police testimony that, within minutes of the robbery, Yelardy was found in close proximity to the bank wearing blue clothing with dye pack residue and in possession of a gun. The jury also heard testimony from Officer Gates regarding

32

his chase of a man wearing dark clothing and carrying a black bag, and how that man turned out to be the same man found sitting on the stoop in possession of a gun and wearing dye-stained clothing just minutes later.

After viewing the aforementioned evidence in the light most favorable to the prosecution, the court concludes that the Delaware Supreme Court reasonably held that the record provided ample evidence from which a rational jury could have concluded that Yelardy was guilty of robbery and possession of a firearm during the commission of a felony. Accordingly, the court will deny claim ten.

### K. Claim Eleven: Forged Indictment

In his final claim, Yelardy alleges that his indictment was invalid because the signature of the grand jury foreman was forged. The legality of an indictment is a matter of state law. *See U.S. Wojtycha v. Hopkins*, 517 F.2d 420, 425 (3d Cir. 1975). Claims based on errors of state law are not cognizable on habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). In addition, Yelardy has failed to rebut the Delaware Supreme Court's factual conclusion that his allegation of a forged signature was baseless. Accordingly, the court will deny claim eleven.

## IV. CERTIFICATE OF APPEALABILITY

When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). If a federal court denies a habeas petition on

procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *Id.*

The court has concluded that Yelardy's petition fails to warrant federal habeas relief, and is persuaded that reasonable jurists would not find this conclusion to be debatable. Therefore, the court will not issue a certificate of appealability.

## V. CONCLUSION

For the reasons stated, Yelardy's petition for habeas relief pursuant to 28 U.S.C. § 2254 is denied without an evidentiary hearing or the issuance of a certificate of appealability. An appropriate order shall issue.

34